IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND DIVISION

| | |
|---|---|
| ON SITE ENERGY COMPANY, INC., ) | |
| ) | |
| Plaintiff, ) | Case No. 2:10-cv-1671-JS-WDW |
| ) | |
| v. ) | |
| ) | **PLAINTIFF'S PRETRIAL** |
| ) | **MEMORANDUM** |
| MTU ONSITE ENERGY CORP., ) | |
| ) | |
| Defendant. ) | |

## Table of Contents

I.   The Nature of the Case ...................................................................1

II.  The Plaintiff .................................................................................1

III. The Defendant ...............................................................................2

IV.  Reverse Confusion Infringement ......................................................3

    A.   Reverse Confusion v. Forward Confusion...........................................3

    B.   Infringement of a Federally Registered Mark—Elements ...............4

    C.   Infringement of an Unregistered Mark—Elements ..........................5

V.   ON SITE ENERGY Merits Protection ..............................................6

    A.   ON SITE ENERGY® is Presumed Valid...........................................6

    B.   Factors Establishing Secondary Meaning .........................................8

    C.   The Evidence of Secondary Meaning ................................................8

VI.   Likelihood of Reverse Confusion ................................................................12

    A.   The *Polaroid* Factors for Reverse Confusion ....................................12

    B.   The Evidence of a Likelihood of Reverse Confusion.........................14

VII.  Defendant's Fraud Allegation ....................................................................16

    A.   It is a Defense Against the Registration Only...................................16

    B.   The Alleged Fraud ............................................................................17

    C.   Fraud in the Failure to Disclose Use by Others—Elements ..........17

    D.   Mr. Jim Durlacher's Response .........................................................19

VIII. On Site Energy's Relief ..............................................................................19

    A.   Damages............................................................................................19

    B.   Injunction.........................................................................................21

    C.   Costs & Fees .....................................................................................22

IX.   Conclusion ...................................................................................................22

I.     The Nature of the Case

On Site Energy sues MTU Onsite Energy for reverse trademark infringement under 15 U.S.C. §§ 1114(1)(a) and 1125(a) of the Lanham Act and under New York Common Law. Plaintiff asks the Court to award it damages, costs and fees, and enter a permanent injunction preventing MTU Onsite Energy from using any formatives of the mark ONSITE ENERGY with or without other terms; in conjunction with the rental, sale, or service of generator sets; in any size from 25 kilowatts to 3250 kilowatts; in the contiguous 48 United States and the District of Columbia.

II.    The Plaintiff

On Site Energy was formed in 1984 by Mr. Irvin French in the wake of a Middle Eastern oil embargo. The price for electricity from Con Edison had skyrocketed. On Site Energy became an overnight success by selling an independent source for electricity. Plaintiff designed, sold, and maintained what are called "cogeneration plants." The production of electricity releases energy in the form of heat. A cogeneration plant captures that waste heat and uses it to provide both heat and air conditioning in addition to electricity. On Site Energy's typical customer at the time would recoup the cost of having their own source for electricity in only three years after being disconnected from Con Edison.

On Site Energy moved into the business of renting, selling, and servicing generator sets in 1988. On Site Energy contracted initially with a company by the name of Aggreko. Aggreko provided a majority of the generator sets, and On Site

Energy acted as its agent distributing them in New York, New Jersey, Connecticut, plus anywhere else in the eastern half of the United States when disaster struck (storm, hurricane, blackout, etc.). The generator sets were offered under the marks AGGREKO and ON SITE ENERGY. On Site Energy was regularly one of Aggreko's top three agents in North America. The relationship lasted 13 years, ending amicably on December 31, 2001. On Site Energy, however, continued in the business under the ON SITE ENERGY mark.

Today On Site Energy offers generator sets in sizes that range from 25 kilowatts to 2000 kilowatts. It has four facilities from which it provides its products and services to customers in Connecticut, New York, New Jersey, Pennsylvania, Ohio, Kentucky, Illinois, Indiana, Michigan, Iowa, Kansas, Missouri, and Tennessee. Plaintiff also does business in other states such as Florida, Louisiana, and Texas in the aftermath of disaster when the local demand for generator sets drastically outweighs local supply.

III.  The Defendant

The MTU Onsite Energy brand of generator sets was launched on September 2, 2008 when a German industrial concern known as Tognum AG acquired a generator-set manufacturer in Mankato, Minnesota. The manufacturer was previously known as Katolight. Tognum AG renamed it MTU Onsite Energy Corporation. MTU Onsite Energy is believed to be a wholly-owned subsidiary of Tognum AG. Defendant manufactures generator sets in sizes that range from 25 kilowatts to 3250 kilowatts and offers them under the marks MTU ONSITE

ENERGY or KATOLIGHT by MTU ONSITE ENERGY. MTU Onsite Energy sells these products through a nationwide network of distributors who then rent, sell, and service generator sets for their customers under the MTU ONSITE ENERGY brand.

IV.   Reverse Confusion Infringement

    A.   Reverse Confusion v. Forward Confusion

A likelihood of confusion may be found in two types of situations supporting claims for trademark infringement: "forward" and "reverse." J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:10 (West 2012)["*McCarthy on Trademarks*"]. The fundamental issue in both situations is the same—whether the consuming public is likely to be confused about the source of products or services of the respective mark users. In the traditional trademark infringement case involving forward infringement, the junior user of a mark uses it to sell goods or services based on the misperception that they originate with the mark's senior user, thereby trading on the generally larger and more well-established senior user's good will. *Id.* Reverse confusion is the opposite—the misimpression that a junior user is the source of the senior user's goods. *Id.*; *Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 490 (2nd Cir. 1988)("two types of potential confusion allegedly support a claim of infringement: ordinary confusion and reverse confusion. Under the Lanham Act confusion is ordinarily the misimpression that the senior user (Banff) is the source of the junior user's (Bloomingdale's) goods. Reverse confusion is the misimpression that the junior user is the source of the senior user's

3

goods.")

In reverse confusion, a junior user saturates the market with a mark which is similar to a senior user's mark, and overwhelms the senior user. *McCarthy on Trademarks* at 23:10. These cases usually involve a large and powerful junior user and a smaller less powerful senior user. *Id.* The public comes to assume that the senior user's products or services are really supplied by the junior user or that the senior user is somehow connected to the junior user. *Id.* The result is that the senior user loses the value of its mark, its product identity, corporate identity, control over its goodwill and reputation, and the ability to move into new markets. *Id.*; *Yarmuth-Dion, Inc. v. D'ion Furs, Inc.*, 835 F.2d 990, 995 (2nd Cir. 1987)(reverse confusion is "an instance in which a person acquainted with the junior user's name becomes confused when confronted with the senior user's name.")

B.  Infringement of a Federally Registered Mark—Elements

To prove infringement of a federally registered mark, On Site Energy must prove, by a preponderance of the evidence, that:

1.  On Site Energy owns a mark that is registered in the U.S. Patent and Trademark Office;

2.  MTU Onsite Energy used in commerce, without On Site Energy's consent, a reproduction, copy, counterfeit, or colorable imitation of On Site Energy's mark in connection with the sale, offering for sale, distribution, or advertising of goods or services, which use is likely to cause confusion. 15 U.S.C. § 1114(1)(a); *Gruner & Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1077-78 (2nd Cir. 1993).

C.    Infringement of an Unregistered Mark—Elements

To prove infringement of an unregistered mark, On Site Energy must prove, by a preponderance of the evidence, that:

1.    On Site Energy is the owner of a valid mark through acquisition of secondary meaning; and

2.    MTU Onsite Energy's subsequent use in commerce, on or in connection with goods or services, of a word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Onsite Energy with MTU Onsite Energy, or as to the origin, sponsorship, or approval of On Site Energy's goods, services, or commercial activities by another person.

It is not necessary that the mark used by defendant be an exact copy of plaintiff's mark. Rather plaintiff must demonstrate that, when viewed in its entirety, defendant' use of his mark is likely to cause confusion in the minds of reasonable prudent purchasers or other relevant members of the public as to the source, origin, sponsorship or approval of the product or service in question, or as to affiliation, connection or sponsorship. 15 U.S.C. § 1125(a)(1)(A); *Brennan's Inc. v. Brennan's Rest., LLC,* 360 F.3d 125, 129-30 (2nd Cir. 2004).

The same analysis is used for common law trademark infringement. *Safeway Stores, Inc. v. Safeway Props., Inc.,* 307 F.2d 495, 498 n. 1 (2nd Cir. 1962); *McDonald's Corp. v. McBagels, Inc.,* 649 F.Supp. 1268, 1279–80 (S.D.N.Y. 1986). If Plaintiff establishes infringement under the Lanham Act, it has necessarily also

5

done so under New York common law. *Baker v. Parris,* 777 F.Supp. 299, 304 (S.D.N.Y. 1991); *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 34 (2d Cir. 1995).

V.   ON SITE ENERGY Merits Protection

   A.   ON SITE ENERGY® is Presumed Valid.

The amount of protection accorded a particular mark is a function of its distinctiveness. "Marks are often classified in categories of generally increasing distinctiveness; ... they may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768 (1992). "The latter three categories of marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection." *Id.* at 769. At the other end of the spectrum are generic marks, which are not protected. *Id.* That leaves "descriptive" marks. A "descriptive" term is one that directly and immediately conveys some knowledge of the characteristics of a product or service. *In re MBNA America Bank, N.A.*, 340 F.3d 1328, 1332 (Fed. Cir. 2003). Descriptive marks, however, are nonetheless protectable if they acquire distinctiveness through use in commerce.  "This acquired distinctiveness is generally called 'secondary meaning.'" *Two Pesos,* 505 U.S. at 769.

Descriptive, suggestive, arbitrary, and fanciful marks can be registered with United States Patent and Trademark Office ("USPTO"). A registered mark creates a rebuttable presumption that the trademark is valid. *Arrow Fastener Co., Inc. v Stanley Works*, 59 F.3d 384, 393 (2nd Cir. 1995). There are two possible

presumptions, and the manner in which the mark is registered determines which of the two presumptions the registrant is entitled. If the USPTO "registers a mark without first requiring the applicant to prove secondary meaning, the holder of the mark is entitled to a presumption that its registered trademark is inherently distinctive, as opposed to merely descriptive." *Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 117 (1st Cir. 2006) (citation omitted). The alleged infringer may then defend suit by proving by a preponderance of the evidence that the mark is not inherently distinctive (i.e., not suggestive, not arbitrary, or not fanciful) but, rather, is merely descriptive of the product or service. *Id.* If on the other hand, the USPTO required the registrant to provide proof of secondary meaning and registered the mark under Section 2(f),[1] the registrant of the mark is entitled to a presumption that the mark has acquired distinctiveness. *Arrow*, 59 F.3d at 393. The alleged infringer may then defend suit by proving by a preponderance of the evidence the absence of secondary meaning. *Id.*

Here, Plaintiff holds a registration for ON SITE ENERGY under Section 2(f). The Lanham Act provides that marks registered on the Principal Register "shall be prima facie evidence" of the validity of the registered mark, of its registration, of the registrant's ownership, and of the registrant's exclusive right to use the mark on the goods or services specified in the registration. 15 U.S.C. § 1115(a). The burden is

---

[1] Section 2(f) of the Lanham Act, 15 U.S.C. § 1052(f), allows the registration of "a mark used by the applicant which has become distinctive of the applicant's goods in commerce" upon "proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made."

thusly on Defendant MTU Onsite Energy to prove by a preponderance of the evidence that secondary meaning is absent. *Arrow*, 59 F.3d at 393.

> B.   Factors Establishing Secondary Meaning

The following factors may be considered in determining whether a mark has secondary meaning: (1) whether people who purchase the product that bears the trademark associate the trademark with the owner; (2) whether the owner has advertised under the claimed trademark; (3) whether the owner successfully used this trademark to increase its sales; (4) whether the owner has used the claimed trademark for an extended period of time; (5) whether the owner's use of the claimed trademark was exclusive; (6) whether defendant intentionally copied the trademark; and (7) whether defendant's use of the trademark has led to actual confusion. *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000); *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1041 (2nd Cir. 1992)("Among the factors that we have found relevant to this inquiry in the past are advertising expenditures, consumer studies, sales success, unsolicited media coverage, attempts to plagiarize and length and exclusivity of use. …There are undoubtedly other types of evidence that would also be relevant to a claim of secondary meaning."); and *McCarthy on Trademarks* § 15:30-34.

> C.   The Evidence of Secondary Meaning
>> 1.  The Public Associates ON SITE ENERGY with Plaintiff

Plaintiff will introduce various certificates of appreciation, thank-you letters, awards, and unsolicited media coverage into evidence to show that the public has

8

come to associate ON SITE ENERGY with Plaintiff.

    2.  Plaintiff's Advertising

Plaintiff will place sample ads and marketing materials into evidence to show that On Site Energy has actively advertised its products and services over the years. Plaintiff will also place its advertising expenses into evidence over the last ten years, along with evidence of their context to show that the amount spent is more than average for a company of its size. This context will take the form of a comparison to the advertising expenses of local competition, as well as, a comparison of these expenses with that of businesses in a national database.

    3.  Sales Records

Plaintiff will put its annual sales figures into evidence over the last 10 years to show that On Site Energy has been a successful enterprise.

    4.  25 Years

Plaintiff will offer evidence of its history to show that it has used the mark ON SITE ENERGY in conjunction with the rental, sale, and service of generator sets for 25 years.

    5.  Plaintiff's Exclusive Use with Generator Sets

Plaintiff intends to introduce evidence that is unaware of any formatives of the mark ON SITE ENERGY being used in the field of generator sets, other than Defendant, who is an infringer.

    6.  Did Defendant copy?

Plaintiff has no evidence that Defendant intentionally copied Plaintiff's mark. Plaintiff believes the evidence will show, however, that Defendant was careless in

not conducting proper research to avoid infringement prior to development of the MTU ONSITE ENERGY brand.

      7.  Actual Confusion

The Court will hear testimony from eleven third-parties that were prospective purchasers of On Site Energy's products or services that believed errantly "they were produced by or affiliated with" MTU Onsite Energy. *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 583 (2nd Cir. 1991)("Evidence of actual confusion that might support Lang's claim would involve purchasers or prospective purchasers of Lang's products who believed that they were produced by or affiliated with Retirement Living's magazine.") Four will be live. Six will be by video with a total running time 1:07:38. One will be read into the record.

Ms. Tina Hansen is expected to testify live how she contacted Plaintiff to obtain information on a transfer switch that was ordered from one of Defendant's distributors, believing Plaintiff was able to provide the information.

Mr. Dan Astrella is expected to testify live how he contacted Plaintiff to obtain a quote for two MTU ONSITE ENERGY generator sets because he thought Plaintiff sold that brand.

Mr. Gary Hogancamp is expected testify live how he contacted Plaintiff because he thought Plaintiff was the entity identified on the side of the generator set where he worked. The generator set, however, bore Defendant's MTU ONSITE ENERGY mark, not Plaintiff's ON SITE ENERGY mark.

Mr. Jay Johneas is a professional purchasing agent. He is expected to testify

live that he contacted Plaintiff for a quote on an MTU ONSITE ENERGY brand of generator set because he thought Plaintiff was associated with MTU ONSITE ENERGY as a franchise, distributor, partnership, or basically related somehow.

Mr. Chris Flom will testify in a video recording that he contacted Plaintiff for a quote on a maintenance contract for an MTU ONSITE ENERGY brand generator set because he thought Plaintiff was one of Defendant's distributors. He will also testify that he expected that Plaintiff could provide maintenance services that were authorized by MTU ONSITE ENERGY. (running time 00:16:01)

Mr. Jim Irvin will testify in a video recording that he contacted Plaintiff for a quote on an MTU ONSITE ENERGY brand of generator set because he thought Plaintiff represented the company. (running time 00:12:14)

Mr. Jim Moran will testify in a video recording that he contacted Plaintiff for a quote on a 125 kilowatt generator set believing that Plaintiff sold MTU Onsite Energy brand generator sets. (running time 00:13:05)

Mr. Tom Mazacek will testify in a video recording that he contacted Plaintiff for information about an MTU ONSITE ENERGY brand of generator set believing that Plaintiff could provide the information. (running time 00:07:18)

Mr. Mark Zindel will testify in a video recording that he contacted Plaintiff for a quote to service six brand new MTU ONSITE ENERGY brand of generator sets believing that he was contacting the company who was identified on the side of the generator sets. (running time 00:07:07)

Mr. Eldon Howard will testify in a video recording that he contacted Plaintiff

to obtain a quote for an MTU ONSITE ENERGY brand generator set believing that he was talking to the company that could provide the generator set. (running time 00:11:54)

Ms. Sarah Roxworthy will testify by written deposition read into the record that she contacted Plaintiff for a quote on an MTU ONSITE ENERGY brand of generator set because of the similarity of names.

VI.   Likelihood of Reverse Confusion.

A.   The *Polaroid* Factors for Reverse Confusion

To assess the like likelihood of consumer <u>forward</u> confusion between two marks, a court applies the eight-factor test set forth in Judge Friendly's landmark decision *Polaroid Corp. v. Polaroid Elects., Corp.*, 287 F.2d 492, 495 (2nd Cir. 1961); *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 130 (2nd Cir. 2004); see also *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2nd Cir. 2003). This test suggests analysis of the following non-exclusive factors: (1) the strength of the plaintiff's mark, (2) the degree of similarity between the two marks, (3) the competitive proximity of the products, (4) the likelihood the plaintiff will bridge any gap, (5) actual confusion (6) the defendant's good faith in adopting its mark, (7) the quality of the defendant's products, and (8) the sophistication of the purchasers. Brennan's, 360 F.3d at 130. This is not a mechanical inquiry in which any one factor is dispositive. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 119 (2nd Cir. 2001). Rather, "each factor must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the product."

*Brennan's*, 360 F.3d at 130 (citation omitted).

The likelihood of <u>reverse</u> confusion is measured according to the *Polaroid* factors described above, with the following distinctions as to the first factor, the strength of the plaintiff's mark, and the sixth factor, the defendant's good faith. In cases of forward confusion, the first *Polaroid* factor assesses the strength of the senior user's mark. A senior user's relative lack of commercial strength, however, should be accorded less weight in a reverse confusion case. This is because "in a reverse confusion case, the junior user is not trying to take a free ride on the recognition value of a strong, senior mark." *McCarthy on Trademarks* § 23:10. "Rather, the Court should evaluate the strength of the junior user's mark so as to gauge its ability to overpower the senior user's mark." *Id.; Sunenblick v. Harrell,* 895 F.Supp. 616, 627-28 (S.D.N.Y.1995), *aff'd,* 101 F.3d 684 (2d Cir.1996) (unpublished table decision), *cert. denied,* 519 U.S. 964 (1996).

The sixth factor in the traditional *Polaroid* analysis examines whether the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation or goodwill. *Brennan's,* 360 F.3d at 130. In the context of reverse confusion, it is unlikely that a larger and better known junior user intends to trade on the reputation of the lesser-known plaintiff. This factor is therefore less relevant in a reverse confusion inquiry, although any finding that the defendant adopted its mark with intent to cause any form of confusion should weigh in favor of the plaintiff. *A & H Sportswear Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, 232 (3rd Cir.2000).

13

B.   The Evidence of a Likelihood of Reverse Confusion

    1.   Relative Strength of <u>Defendant's</u> mark

MTU Onsite Energy is part of a multinational conglomerate. Due to confidentiality concerns, On Site Energy is not at liberty to disclose the figures in this memo without seal. But as will be seen at trial, Defendant's sales and advertising expenditures dwarf Plaintiff's. MTU Onsite Energy and its distributors regularly saturate the generator-set market with ads promoting MTU ONSITE ENERGY. On Site Energy advertising efforts, though large for its size, are overwhelmed by Plaintiff's massive advertising.

    2.   "ON SITE ENERGY" v. "mtu ONSITE ENERGY"

Witnesses will testify that they did not notice the small "mtu" to the lower left of Defendant's logo. Hence with the minor exception of an additional space, the marks appear to be spelled and sound the same:



14

3.    The Products Are Found Together

On Site Energy is in direct competition with Defendant's distributors and the parties products are found advertised together. The evidence will show that both ON SITE ENERGY and MTU ONSITE ENERGY are used to promote the rental, sale, and service of generator sets. The evidence will show that the parties' respective marks are carried simultaneously in an industry reference guide known as The Blue Book. The evidence will also show that several of Defendant's distributors even put both Plaintiff and Defendant's generator sets into the marketplace. In other words, there are times when customers receive Plaintiff's product from Defendant's own distributors while those same distributors display the MTU ONSITE ENERGY brand.

4.    There is no product gap.

Plaintiff rents, sells, and services generator sets. Defendant and its distributors also rent, sell, and service generator sets.

5.    Actual Confusion

As discussed earlier, significant actual confusion has occurred. Plaintiff also intends to offer into evidence the results of a survey which establish a likelihood of reverse confusion.

6.    Defendant's good faith in adopting the mark

This factor is irrelevant to determine the likelihood of reverse confusion. *A & H Sportswear,* 237 F.3d at 232.

15

7.    The Quality of Defendant's Products

The parties' products and services are likely of equal quality. Products of equal quality, however, tend to create confusion of source because of that very similarity. *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 505 (2nd Cir. 1996).

8.    The sophistication of the purchasers.

A generator set is not a commodity. It is admittedly a sophisticated item with sophisticated buyers that, in general, are likely to be more careful and discriminating when purchasing them. Plaintiff, however, has testimony of several professional buyers that found themselves confused. And, "where as here some members of the sophisticated market in which the parties operate have already been *actually* confused, it cannot be gainsaid that others in the same market are likely to be confused." *Morningside Group v. Morningside Capital Group*, 182 F.3d 133, 143 (2nd Cir. 1999)(emphasis original).

VII.  Defendant's Fraud Allegation

A.    It is a Defense Against the Registration Only.

MTU Onsite Energy argues that the registration of ON SITE ENERGY was procured by fraud. As an initial matter it is unclear why Defendant pursues this defense. Even if it succeeds, Plaintiff's rights under Lanham Act § 43(a)[2] continue unabated and are sufficient to obtain both damages and an injunction. *Orient Express Trading Co. v. Federated Dep't Stores, Inc.* 842 F.2d 650, 654 (2nd Cir. 1988)(fraud in the registration process leading to cancellation of a registration does

---

[2] 15 U.S.C. § 1125(a).

not bar possible relief under Lanham Act § 43(a) claim for infringement of
unregistered rights.); *McCarthy on Trademarks* § 31:60.

B.    The Alleged Fraud

Plaintiff's understanding of Defendant's fraud claim is that Plaintiff
erroneously signed the application oath knowing others used the mark. The facts
supposedly supporting the defense are as follows:

● Plaintiff's agent filed its trademark application for ON SITE ENERGY and
signed an oath that, in relevant part, read:

> …to the best of his/her knowledge and belief no other person, firm, or
> corporation, or association has the right to use the mark in commerce,
> either in the identical form thereof or in such near resemblance thereto
> as to be likely, when used on or in connection with the goods/services of
> such other person, to cause confusion, or to cause mistake, or to
> deceive;…

● Defendant's trademark counsel responded to a cease & desist letter by arguing
that ON SITE ENERGY was generic and listed seven companies that were "in the
energy field" to support his claim:

> On-Site Energy, Alexandria, VA
> Onsite Energy, Carlsbad, CA
> Onsite Power Inc., Aurora, CO
> On-Site Power, Ocala, FL
> Onsite Power Systems, Davis, CA
> DTE On-Site Energy, LLC, Ann Arbor, MI
> On-Site Energy Providers (OSEP), LLC, Chicago, IL

● Plaintiff's counsel did not disclose any of these alleged third-party users to the
USPTO.

C.    Fraud in the Failure to Disclose Use by Others—Elements

To prove fraud, MTU Onsite Energy must prove, by clear and convincing

17

evidence,[3] that:

1.      There was in fact another use of the same or a confusingly similar mark at the time the oath was signed;

2.      the other user had legal rights superior to applicant's rights;

3.      applicant knew that the other user had rights in the mark superior to applicant's and either believed that a likelihood of confusion would result from applicant's use of its mark or had no reasonable basis for believing otherwise; and

4.      applicant, in failing to disclose these facts to the trademark office, intended to procure a registration to which applicant was not entitled. *McCarthy on Trademarks* § 31:75-77.

As a result, it is not fraud if the applicant had a good faith belief that: (a) it used its mark before the third-party in question, (b) the difference in the parties' marks prevented a likelihood of confusion, or  (c) the difference in the parties' goods or services prevented a likelihood of confusion. *Id.*

A senior user has no duty to disclose to the USPTO the subsequent use by others of the same or similar mark. *Capital Speakers, Inc. v Capital Speakers Club*, 41 U.S.P.Q.2d 1030, 1033 ("As the prior user, respondent was under no obligation to the PTO petitioner's subsequent use when respondent applied to register its mark.")

"A trademark applicant also has no duty to investigate potential conflicting marks that might be found in a trademark search and therefore there is no duty to investigate when another party might have started using a similar mark."

---

[3] *In re Bose Corp.*, 580 F.3d 1240 1243-1245 (Fed. Cir. 2009).

*McCarthy on Trademarks* § 31:77 citing inter alia, *Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666, 670-671 (7th Cir. 1982).

D.   Mr. Jim Durlacher's Response

Mr. Jim Durlacher will appear live before the Court to respond to Defendant's charges. He is expected to testify that the only third-party use of ON SITE ENERGY for which he was aware while the application was pending was that of Onsite Energy Corporation in Carlsbad, California. He will testify that he believed that this third party was an energy management company and that it did not rent, sell, or service the same products as Plaintiff. He will then state that it was his belief that the differences in the goods and services between his client and that of the Carlsbad-California Company precluded a likelihood of confusion.

Mr. Durlacher is also expected to testify that it is his belief he has no obligation to identify subsequent users of ON SITE ENERGY or infringing uses of ON SITE ENERGY to the USPTO.  He will also explain that it is his belief that he was under no duty to investigate any allegations of third-party use presented in the letters from Defendant's trademark counsel.

VIII. On Site Energy's Relief

A.   Damages

On Site Energy asks to be awarded 0.25% of MTU Onsite Energy U.S. generator-set sales from the 4th quarter of 2008 to the end of 2011 to estimate its damages. Plaintiff intends to present a "reasonable royalty" theory of recovery. This theory is based upon a hypothetical license agreement between the licensee, MTU

19

Onsite Energy, and the licensor, On Site Energy, and a hypothetical licensing fee. The analysis assumes that MTU Onsite Energy and On Site Energy would have agreed to a license to use On Site Energy's mark as the result of a hypothetical negotiation between the parties.

Under the Lanham Act, a successful Plaintiff may, "subject to the principles of equity ... recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a) "The court shall assess such profits and damages or cause the same to be assessed under its direction" and ensure that any relief awarded "shall constitute compensation and not a penalty." *Id.* A Plaintiff in a trademark action may recover a "reasonable royalty" under the heading of actual damages. *Gucci Am., Inc. v. Guess?, Inc.*, ___F.Supp2d___, 2012 WL 456519 at *3, 102 U.S.P.Q.2d 1615, 1620 (S.D.N.Y. 2012).

Many courts, including district courts in this circuit, have permitted such evidence. *Go Med. Indus. PTY, Ltd. v. Inmed Corp.,* 471 F.3d 1264, 1274 (Fed. Cir. 2006); *Sands, Taylor, & Wood v. Quaker Oats Co.,* 34 F.3d 1340, 1343 (7th Cir. 1992); *Gucci Am., Inc. v. Guess?, Inc.*, ___F.Supp2d___, 2012 WL 841620 at *3 (S.D.N.Y. March 13, 2012). Such an award has also been tacitly approved by the Second Circuit. *Nestlé Holdings, Inc. v. Comm'r of Internal Revenue,* 152 F.3d 83 (2nd Cir. 1998)("Royalty models are generally employed to estimate an infringer's profit from its misuse of a patent or trademark.")

Based the circumstances of the case, On Site Energy also asks the Court to exercise its power and increase this award up to three times. 15 U.S.C. § 1117(a).

The evidence will show that Defendant is pursuing an unfounded fraud claim. The evidence will also show that Defendant was unreasonably careless when it selected its mark. The Defendant launched a multi-million dollar ad campaign to introduce the brand MTU ONSITE ENERGY based on the verbal opinion of one individual in Germany. No one in the United States appears to have been consulted and Defendant has no formal search or pre-litigation written opinions that justify its actions. *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 80 F.3d 749, 754 (2nd Cir. 1996)("[Defendant] cannot lay claim to a 'good faith' belief that is was not infringing on [Plaintiff's] mark because it neither fully explored others' rights to STAR CLASS nor ceased its infringing behavior when it was sued.")

B.   Injunction

On Site Energy also asks the Court to enter a permanent injunction preventing MTU Onsite Energy from using any formatives of the mark ONSITE ENERGY with or without other terms; in conjunction with the rental, sale, or service of generator sets; in any size from 25 kilowatts to 3250 kilowatts; in the contiguous 48 United States and the District of Columbia.

"To obtain a permanent injunction in a trademark action, a party 'must succeed on the merits and show the absence of an adequate remedy of law and irreparable harm if the relief is not granted.'" *Patsy's Italian Rest., Inc. v. Banas*, 575 F.Supp.2d 427, 464 (E.D.N.Y. 2008) (quoting *Roach v. Morse*, 440 F.3d 53, 56 (2nd Cir. 2006)). It is "well-established principle that there is a presumption of irreparable harm where there exists a likelihood of consumer confusion." *Tuccillo v.*

*Geisha NYC, LLC*, 635 F.Supp.2d 227, 249 (E.D.N.Y. 2009)(citing *Weight Watchers Int'l, Inc. v Luigino's, Inc.*, 423 F.3d 137, 144 (2nd Cir. 2005)("[a] plaintiff who establishes that infringer's use of its trademark creates a likelihood of consumer confusion generally is entitled to a presumption of irreparable injury.") The plaintiff "must also show the threat of a continuing violation in order to obtain injunctive relief." *Lyons P'ship, L.P. and Hit Entm"t v. D&L Amusement & Entm't, Inc.*, 702 F.Supp.2d 104, 119 (E.D.N.Y. 2010)(citation omitted).

The Court should enter the requested permanent injunction if Defendant MTU Onsite Energy is found liable. A finding of liability holding satisfies all the above requirements because Defendant still uses MTU ONSITE ENERGY and will not stop unless enjoined by this Court.

C.    Costs & Fees

On Site Energy will timely move the Court for its costs and attorneys fees.

IX.   Conclusion

MTU Onsite Energy is infringing On Site Energy's valid trademark. The Court should grant On Site Energy relief.

Respectfully submitted,

s/Kurt N. Jones
Kurt N. Jones
Woodard, Emhardt, Moriarty,
McNett & Henry LLP
111 Monument Circle, Suite 3700
Indianapolis, IN  46204-5137
Telephone:  317-634-3456
Facsimile:  317-637-7561
kjones@uspatent.com

#855369

22

Certificate Of Service

I hereby certify that on July 16, 2012, Plaintiff's Pretrial Memorandum was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Eastern District's Local Rules, and/or the Eastern District's Rules on Electronic Service upon the following parties:

Kathleen E. McCarthy
King & Spalding LLP
1185 Avenue of the
Americas
New York, NY 10036
212-556-2345
kmccarthy@kslaw.com

Amy E. Jones
King & Spalding LLP
1180 Peachtree Street
Atlanta, GA 30309
404-572-4600
404-572-5170 (fax)
ejones@kslaw.com

Erik J. Dykema
King & Spalding LLP
1185 Avenue Of The
Americas
New York, NY 10036
212-556-2100
212-556-2222 (fax)
edykema@kslaw.com

Yuridia Caire
King & Spalding
333 Twin Dolphin Drive
Suite 400
Redwood City, CA 94065
650-590-0703
650-590-1900 (fax)

Bruce W. Baber
King & Spalding LLP
1180 Peachtree Street
Atlanta, GA 30309
404-572-4600
404-572-5100 (fax)
bbaber@kslaw.com

David S. Desmond
Van Nostrand & Martin
P.O. Box 307
53 Broadway
Amityville, NY 11701
631-264-0303
631-264-0314 (fax)
daviddesmond@optonline.net

Linda D Kennedy
Rader, Fishman & Grauer
PLLC
39533 Woodward Avenue
Suite 140
Bloomfield Hills, MI
48304
248-594-0600
248-594-0610 (fax)

Bill C. Panagos
Rader, Fishman & Grauer
PLLC
39533 Woodward Ave
Suite 140
Bloomfield Hills, MI
48304
248-594-0600
248-594-0610 (fax)
bcp@raderfishman.com

s/Kurt Jones
Kurt N. Jones