Kathleen E. McCarthy (KM-9219)
KING & SPALDING, LLP
1185 Avenue of the Americas
New York, New York 10036-4003
Tel: (212) 556-2100
Fax: (212) 556-2222
kmccarthy@kslaw.com
Attorneys for Defendant
MTU ONSITE ENERGY CORP.

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND DIVISION

| | |
|---|---|
| ON SITE ENERGY COMPANY, INC., ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 2:10-cv-01671-JS-WDW |
| ) | |
| v. ) | |
| ) | |
| MTU ONSITE ENERGY CORP., ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT MTU ONSITE ENERGY CORP.'S
PRETRIAL MEMORANDUM**

# TABLE OF CONTENTS

I.      NATURE OF CASE ..........................................................................................1

II.     THE DEFENDANT MTU ...............................................................................2

III.    THE PLAINTIFF ............................................................................................7

IV.     THE DISPUTE ................................................................................................9

V.      PLAINTIFF HAS NO VALID TRADEMARK ...........................................13

      A.      Onsite Energy Is Generic ..................................................................13

      B.      On Site Energy Has No Secondary Meaning .....................................14

VI.     "MTU ONSITE ENERGY" IS NOT INFRINGING .....................................15

      A.      Strength of the Mark - On Site Energy is Weak ................................16

      B.      Similarity of the Marks: The Distinguishing MTU Mark ..................16

      C.      Proximity of the Products & Services: Rental vs. Sales Market ..........17

      D.      Bridging the Gap: Plaintiff has no Interest in Manufacturing Generators .............18

      E.      No Relevant Actual Confusion Exists ................................................18

      F.      MTU'S Good Faith ............................................................................18

      G.      Quality of MTU's Product .................................................................19

      H.      The Sophistication of the Buyers .......................................................19

VII.    PLAINTIFF HAS NOT BEEN DAMAGED .................................................19

VIII.   MTU'S USE OF ONSITE ENERGY IS A FAIR DESCRIPTIVE USE .........20

IX.     MTU CONTINUOUSLY USED "MTU ONSITE ENERGY" IN MANY REGIONS PRIOR TO ANY USE IN THOSE REGIONS BY PLAINTIFF .....................................21

X.      PLAINTIFF'S REGISTRATION WAS PROCURED BY FRAUD ...............22

XI.     PLAINTIFF'S DELAY IN TAKING ACTION PREJUDICED MTU ...........22

XII.    MTU'S REQUESTED RELIEF .....................................................................23

      A.      Cancellation of Plaintiff's Trademark Registration ...........................23

      B.      Declaratory Judgment .......................................................................23

      C.      Costs & Attorney's Fees ....................................................................23

XIII.   CONCLUSION ...............................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aromatique, Inc. v. Gold Seal, Inc.*,
   28 F. 3d 863 (8th Cir. 1994) ........................................................................12, 14

*Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*,
   70 F.3d 267, 36 U.S.P.Q.2d 1855 (2d Cir. 1995) ..............................................21

*Charles of Ritz Group, Ltd. v. Marcon, Ltd.*,
   635 F. Supp. 158, 230 U.S.P.Q. 377 (S.D.N.Y. 1986) ......................................20

*Continental Airlines Inc. v. United Air Lines Inc.*,
   53 U.S.P.Q.2d 1385, 1999 WL 1421649 (T.T.A.B. 2000) ..................................13

*Cosmetically Sealed Industries, Inc. v. Chesebrough-Pond's USA Co.*,
   125 F. 3d 28 (2d Cir. 1997)........................................................................18, 21

*Harley-Davidson, Inc. v. Grottanelli*,
   164 F.3d 806 (2d Cir. 1999).............................................................................13

*In re Bose Corp.*,
   580 F.3d 1240 (Fed. Cir. 2009).........................................................................22

*Jahr USA Publ'g v. Meredith Corp.*,
   991 F.2d 1072 (2d Cir. 1993)............................................................................17

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
   543 U.S. 111 (2004)..........................................................................................20

*Lang v. Retirement Living Pub. Co., Inc.*,
   949 F. 2d 576 (2d Cir. 1991).......................................................................15, 18

*McGregor-Doniger Inc. v. Drizzle Inc.*,
   599 F. 2d 1126 (2d Cir. 1979)..........................................................................14

*Murphy Door Bed Co. v. Interior Sleep Systems, Inc.*,
   874 F.2d 95 (2d Cir. 1989)................................................................................13

*Orient Express Trading Co. v. Federated Department Stores, Inc.*,
   842 F.2d 650 (2d Cir.1988)...............................................................................12

*Pilates, Inc. v. Current Concepts, Inc.*,
   120 F. Supp. 2d 286 (SDNY 2000).............................................................12, 13

*Polaroid Corp. v. Polaroid Elec. Corp.*,
   287 F.2d 492 (2d Cir. 1961)..............................................................................15

i

*Sunmark, Inc. v. Ocean Spray Cranberries, Inc.*,
    64 F. 3d 1055 (7th Cir. 1995) ...............................................................................21

*THOIP v. Walt Disney Co.*,
    788 F. Supp. 2d 168 (S.D.N.Y. 2011) .......................................................15, 16, 18

*Thompson Med. Co. v. Pfizer, Inc.*,
    753 F.2d 208 (2d Cir. 1985) ...................................................................................14

*Thrifty Rent-A-Car System v. Thrift Cars, Inc.*,
    831 F. 2d 1177 (1st Cir. 1987) ...............................................................................22

*William R. Warner & Co. v. Eli Lilly & Co.*,
    265 U.S. 526 .............................................................................................................21

*Wonder Labs, Inc. v. Procter & Gamble Co.*,
    728 F. Supp. 1058, 14 U.S.P.Q.2d 1645 (S.D.N.Y. 1990) ....................................20

## STATUTES

15 U.S.C § 1115 (b)(4) ....................................................................................................20

15 U.S.C. § 1115(b)(5) ...................................................................................................22

15 U.S.C. § 1117(a) ........................................................................................................23

I.      NATURE OF CASE

This trademark dispute involves the phrase "onsite energy."

"Onsite" means "taking place or situated on a particular site or premises."  "Energy" means "power derived from the utilization of physical or chemical resources, especially to provide light and heat or to work machines."

Together, "onsite energy" refers to providing a direct source of **energy**, **on** or at a particular **site**.  "Onsite energy" is also referred to as "onsite power."  The alternative to "onsite energy" would be securing power through a connection to a utility grid that links an offsite source of energy, such as a generating station like a power plant, to the end user's site via transformers and transmission lines like wires and cables.  In other words, a need for power can be met with  the source of the energy generated to provide that power either onsite or offsite.

Given this meaning, it is not surprising that the phrase "onsite energy" appears in a generic sense in numerous publications, in the specifications of patents, on websites, in the descriptions of services in trademark applications and similar manners.  Dozens of company names include the phrase "onsite energy" or "onsite power."

Onsite energy often takes the form of a power generator.  Generators are sophisticated pieces of equipment available in various sizes.  Small units such as a 7000 watt portable generator can be purchased at Home Depot and used to temporarily run household appliances. Extremely large units, up to 3250 kilowatts (3,250,000 watts), weigh more than 60,000 pounds and can be used to keep a factory or hospital operational.  Small portable generators are not at issue here, as Plaintiff rents generators in sizes ranging from 25 kW to 2,000 kW whereas Defendant manufactures and sells generators in sizes ranging from 25kW to 3,250 kW.  The main components of these generators are (1) an engine; (2) an alternator; (3) a fuel system; (4) a voltage regulator; (5) cooling and exhaust systems; (6) a lubrication system; (7) a battery

charger; (8) a control panel; and (9) a main assembly / frame.  The main function of these generators is to provide energy onsite.

## II.    THE DEFENDANT MTU

Defendant MTU Onsite Energy  Corporation ("MTU") is owned by Tognum America, Inc., which in turn is owned by Tognum AG, a leading global supplier of engines and energy systems.

MTU brand engines are well-known and have a well-deserved reputation for quality and innovation among those who work in industries where engines are used.  MTU engines have been used in onsite energy power generators for decades.  In 2006, Tognum bought the Minnesota-based Katolight, which was at that time a customer that purchased MTU engines and used them to build and sell generators.  Tognum believed that Katolight's generator business would supply a steady source of demand for MTU engines and help expand Tognum's engine business.

At the time, Tognum also owned other power generation companies using various names such as MTU Detroit Diesel, CFC Solutions, MDE and MTU Power Generation.  Marketing so many different brands in the onsite energy market segment was unwieldy and Tognum studied how best to streamline its onsite energy marketing.  Tognum wanted a name that highlighted one of its brands as well as described the particular application of the brand in the onsite energy market.  After consideration of different names, a decision was made to use the MTU brand name, due to the existing valuable reputation for quality and innovation for the mark MTU in the engine market, and to describe the particular applications at issue (power generators used to

provide onsite energy) with the descriptor ONSITE ENERGY.  Thus, the new name selected for Tognum's global onsite energy business unit was MTU ONSITE ENERGY.[1]

The MTU ONSITE ENERGY name was cleared through Tognum's international trademark counsel in Germany, Dr. Gerhard Bauer.  Dr. Bauer, recently the President of the International Trademark Association, was then Chief Trademark Counsel for Daimler and had provided trademark advice to Tognum and its affiliates for years.[2]  Dr. Bauer believed, quite understandably, that "onsite energy" was not protectable since the phrase clearly described the business segment at issue.  Nevertheless, he conducted appropriate searches to confirm his views and advised Tognum that the name MTU ONSITE ENERGY was clear for use.

In September 2008, the new name was launched in Mankato, Minnesota and around the globe.  The logo includes the existing MTU red and blue logo with the added words ONSITE ENERGY in gray.  These added words are a means of telling the public that this particular Tognum MTU division provides onsite energy systems, unlike its sister MTU division which provides engines for boats and vehicles.

The joint mtu-online.com website looks like this on the home page, again with the emphasis on the MTU brand and existing MTU logo and with the added descriptor ONSITE ENERGY identifying the nature of that segment of the MTU business:

---

[1] TOGNUM ONSITE ENERGY was another name considered but TOGNUM did not have the already established brand recognition and reputation for quality that the MTU mark had for engines.

[2] Tognum has had a longstanding relationship with Daimler and is now owned by Daimler and Rolls-Royce.



Since September 2008, MTU has manufactured MTU ONSITE ENERGY generator sets in the former Katolight Minnesota facility.  MTU is the ninth largest employer in the Mankato area, providing jobs to more than 340 local residents.

MTU sells its generator sets nationally.  MTU sells directly to various national accounts, but MTU's largest customers are independently owned and operated distributors.  These distributors receive favorable pricing (wholesale prices) and are assigned specific geographic areas of sale.  The distributors purchase MTU engines, partial MTU generators or complete MTU generator sets.  The distributors typically employ service and installation specialists.  These distributors may advertise their product offerings using the MTU ONSITE ENERGY logo along with the logos of other equipment manufacturers, but operate using their own business names.  These business names include names such as Atlantic Power Systems, GT Power

Systems, Peak Power Systems, Able Equipment Rental, and Stuart & Stevenson.   Below are

sample displays taken from distributor websites:







Since the launch of MTU ONSITE ENERGY, MTU has worked to expand its business in a difficult economic environment while maintaining quality and innovation for its products. Among other achievements, during the last four years, MTU has:

- been awarded an ISO 14001 certification attesting to the international standards of its environmental management system in October 2008;

- been awarded an ISO 9001:2008 certification attesting to the international standards of its quality management system in June 2009;

- earned Official Testing Center status from the industry association EGSA Technician Certification program for its Mankato training center facility in October 2009;

- received a Gold Award in the Product of the Year category from *Consulting Specifying Engineer* magazine for its MTU Series 1600 generator set in October 2010;

- attained International Building Code (IBC) seismic certification for its 3250 kW generator set, the largest unit to ever undergo successful shake-table testing indicating the suitability of the unit to continue to continue to provide onsite energy after an earthquake, in February 2011; and

- been named a finalist in the Product of the Year category from *Consulting Specifying Engineer* magazine for its MTU 8v Series 1600 generator set, in April 2012 (winners to be announced in September).

MTU focuses its marketing efforts on a very sophisticated audience consisting of its distributors and consulting specifying engineers. MTU's marketing efforts include training programs and seminars and other educational events that aim to identify and explain the complex features of the products in the MTU product line. Consulting specifying engineers are in

6

position to specify particular brands of generator sets for various large construction projects where onsite energy will be required, such as nursing homes, healthcare facilities, airports, and other businesses that require a constant source of back-up power.  Internet search engines, e-commerce retailers and data storage companies represent some of the other industries that need onsite energy to ensure a constant stream of power for their servers.  Securing placement of its products in specifications for these larger construction projects is one of MTU's business goals.

MTU continues to use the KATOLIGHT name on some of its products directed to the agriculture industry.   Other than those agricultural products, MTU uses the MTU ONSITE ENERGY name on its products that are sold from the Mankato facility for use in the U.S. and global onsite energy markets.  All told, MTU produces between 3500 and 5000 units per year in Minnesota.  This represents only about 10% of the generator market in the United States. MTU's competitors include the top market leaders Caterpillar and Cummins and other manufacturers like Generac and Kohler.

## III.    THE PLAINTIFF

Plaintiff is owned, along with a few other companies, by Irvin French.  In the 1960s after serving in the Army, Mr. French went to college, and while obtaining his degree, worked for the diesel engine company Cummins.  Eventually Cummins offered Mr. French the opportunity to run the Cummins Metropower distributorship in the New York and New Jersey areas, selling Cummins engines and generator sets to industries and commercial entities.  Mr. French ran that Cummins distributorship from 1972 until 1991.

In 1984, while he was still running Cummins Metropower, Mr. French set up a separate corporate entity, On Site Energy Company, Inc. ("OSE").  There is no evidence that anyone involved with the business did a trademark search for "ON SITE ENERGY" and no trademark applications were filed at the time.

OSE was set up as a side business to address the rapidly growing field of providing cogeneration units that supplied energy onsite.  Cogeneration helped businesses avoid the then-skyrocketing cost of obtaining energy offsite from utilities.  The cogeneration craze died down once the cost of energy obtained offsite decreased with lower utility rates.

In 1988, the nature of the business shifted.  The OSE entity ceased its cogeneration business and was used to house Mr. French's new Aggreko generator rental distributorship instead.   At the time, Aggreko, a generator manufacturer, offered generator rental distributorships to various Cummins distributors since Aggreko generators used Cummins engines.  Mr. French's company acted as an Aggreko distributor in the tri-state area until the relationship was terminated by Aggreko in 2001.  The vast majority of the units rented by the company from 1988 to 2001 were Aggreko units, with just a few generators from other manufacturers in the mix.

From 2001 forward, On Site Energy Company, Inc. has rented a variety of generator brands, including Atlas-Copco and Multi-Quip.  The company has its main office in Hicksville, New York with a small branch office in New Jersey.[3]  An office was opened in Pennsylvania in 2003 but closed in 2007 for financial reasons.

More than 80% of the company's  business is rentals.  A very small portion of the business is sales – and those sales mostly involve sales of used inventory.  The vast majority of that business takes place in the New York - New Jersey - Connecticut tri-state area.  Service

---

[3] Other companies owned by Mr. French have offices in Indiana and Connecticut.

work is limited to areas in the vicinity of the New York and New Jersey offices where service personnel are located.[4]

Occasionally, the company engages in what is known as "re-renting" its units to remote locations such as Texas or Florida.  A disaster (such as Hurricane Katrina) creates an unusual demand for onsite energy supply in a particular area .  Suddenly there is no offsite energy source as the utility works to repair damaged equipment and transmission lines.  All locally available sources of onsite energy are immediately put to use.   Users of energy in affected locations are forced to look far afield for help and are willing to pay for significant added transportation costs in order to have onsite energy because they have no other options.  In those situations, local rental businesses in the area reach out to businesses in unaffected areas and engage in a "re-rent" transaction.  The local business in the affected area contracts to rent a unit from a business in an unaffected area and then "re-rents" that unit to its local customer.  In the case of a re-rent transaction, the company's customer is the local rental company, not the end user.

## IV.    THE DISPUTE

Sometime after the MTU ONSITE ENERGY launch in September 2008, Mr. French noticed an announcement regarding the name change and  became, in his own words, "irritated." Mr. French consulted with counsel and the following ensued:

1.    On January 16, 2009, OSE filed a trademark application for the mark ON SITE ENERGY, seeking to register the mark in connection with the rental and sale of "power generation and temperature control equipment" claiming use since 1989;

---

[4] Plaintiff has a manufacturing facility in Indiana, called Onsite Manufacturing, that makes an emergency response heating and chilling unit called the PEACH.  Plaintiff also recently began renting generators in the Indiana area.

2.       On January 19, 2009 – three days after OSE's application was filed with the USPTO – Plaintiff's counsel Mr. Durlacher sent a cease and desist letter to MTU on behalf of OSE (Trial Ex. A);

3.       On February 27, 2009, MTU responded, setting forth evidence of the genericness and third party use of the phrase "on-site energy" (Trial Ex. B);

4.       On March 19, 2009, Plaintiff, again through Mr. Durlacher, reiterated its cease and desist demand to MTU (Trial Ex. C);

5.       On March 30, 2009, the USPTO rejected Plaintiff's application on the grounds that the mark was merely descriptive in an office action addressed to Mr. Durlacher (Trial Ex. 2);

6.       On April 17, 2009, MTU again responded to OSE, this time providing Mr. Durlacher with print-outs of substantial evidence showing that OSE's alleged mark was generic, including more than **176** pages of materials showing use of the phrase "on-site energy" in the following categories:

      a.   in publications dating back to the 1960s;

      b.   on websites and other Internet sources;

      c.   in business names;

      d.   in references to businesses providing on-site energy;

      e.   in press releases;

      f.   in trade conference agendas and materials;

      g.   in employment listings;

      h.   in book titles and texts;

      i.   in trademark registrations and applications; and

j.   in patents (Trial Ex. D).

7.      On September 25, 2009, Mr. Durlacher submitted a response to the USPTO arguing that the mark was not merely descriptive and amending the description of services claimed in the OSE application to cover "power generation and temperature control equipment <u>used for maintaining a desired temperature range for the interior of a structure</u>" (Trial Ex. 2);

8.      On October 19, 2009, the PTO ***again*** rejected the mark as merely descriptive in another office action addressed to Mr. Durlacher (Trial Ex. 2); and

9.      On November 5, 2009 – more than six months after receiving from MTU's counsel extensive evidence documenting the extensive and widespread third-party use of the phrase "on site energy" as a generic term – Mr. Durlacher on behalf of OSE submitted a sworn statement to the PTO in which he asserted that:

> The mark has become distinctive of the goods/services through the applicant's ***substantially exclusive*** and continuous use in commerce for at least the five years immediately before the date of this statement. (emphasis added) (Trial Ex. 2).

10.    On March 16, 2010, only after Plaintiff submitted this claim that its use of the mark was "substantially exclusive" and had been for at least five years, the USPTO withdrew its repeated rejections of OSE's application and issued the registration (Trial Ex. 1).

11.    On April 14, 2010, OSE filed its complaint asserting claims of trademark infringement;

12.    On April 15, 2010, OSE renewed its demands that MTU cease use of the phrase "onsite energy" after having failed to pursue those demands for more than 11 months (Trial Ex. E and F);

13.    OSE attorney Kurt Jones, from the same office as Mr. Durlacher, took over the matter and engaged in settlement discussions with MTU;

14.    On July 13, 2010, OSE filed an amended complaint and continued discussions with MTU;

15.    On October 26, 2010, after settlement talks failed and OSE indicated it would pursue this action, MTU filed its answer and counterclaims, seeking to cancel the OSE registration and a declaratory judgment that the mark is generic or not infringed.

OSE asserts two claims -- for infringement of a registered mark and for infringement of common law rights.  Defendant asserts that (1) the mark is not valid as either generic or merely descriptive with no secondary meaning; (2) the registration was procured through fraud; and (3) its use is not infringing.  If the mark is found to be generic or descriptive with no secondary meaning, the mark is invalid, the registration must be cancelled and neither of Plaintiff's claims succeed.  *E.g., Pilates, Inc. v. Current Concepts, Inc.*, 120 F. Supp. 2d 286 (SDNY 2000); *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F. 3d 863 (8th Cir. 1994).  If the mark is found to be valid, but the registration is found to be procured through fraud, the registration must be cancelled but Plaintiff's common law rights remain.  Plaintiff must demonstrate when and where its descriptive mark acquired rights through secondary meaning.  *Orient Express Trading Co. v. Federated Department Stores, Inc.*, 842 F.2d 650, 653-54 (2d Cir.1988) (common law rights remain after registration cancelled for fraud).  With or without the registration, if the mark is found to be valid, Plaintiff still must prove that the MTU use is infringing in order to succeed.

## V.    PLAINTIFF HAS NO VALID TRADEMARK

### A.    Onsite Energy Is Generic

"Onsite energy" is generic because it is a common or general phrase for services whose primary significance to the consuming public is to identify a class of similar services, regardless of who offers them.  *Pilates, Inc. v. Current Concepts, Inc*., 120 F. Supp. 2d 286 (SDNY 2000) ("Pilates" generic for type of exercise).  This conclusion is amply supported by:

- Dictionary definitions;

- generic use of the term by MTU, competitors and other persons in the trade;

- plaintiff's own generic use ("CONTACT US FOR YOUR ONSITE ENERGY NEEDS"); and

- generic use in the media, in patent specifications, in trademark office services descriptions and in internet articles and industry publications.

*See Murphy Door Bed Co. v. Interior Sleep Systems, Inc*., 874 F.2d 95 (2d Cir. 1989) (dictionary listings are "influential" because they reflect the general public's perception of a mark's meaning and implication); *Harley-Davidson, Inc. v. Grottanelli*, 164 F.3d 806 (2d Cir. 1999) ("Though not conclusive, dictionary definitions of a word to denote a category of products are significant evidence of genericness"); *Continental Airlines Inc. v. United Air Lines Inc*., 53 U.S.P.Q.2d 1385, 1999 WL 1421649 (T.T.A.B. 2000) (taking judicial notice of dictionary definitions in holding "e-ticket" to be a generic name for electronic airline ticketing services).

Numerous third parties use the phrase in their company and organizational names as well to describe their businesses.  These companies and organizations are located throughout the country and include:

1.    Onsite Energy Corporation located in California;

2.    Onsite Energy LLC located in Michigan;

13

3.      On-Site Energy located in Virginia;

4.      On Sight Energy located in Delaware;

5.      DTE Energy's division called On-Site Energy located in Michigan;

6.      American DG Energy's slogan to "Convert Power to Profit With an On-site Energy Solution From American DG Energy" located in Massachusetts;

7.      Austin Energy offering "On-Site Energy Systems/District Cooling" located in Texas;

8.      Texas Engineer offers "On Site Energy Consulting" located in Texas;

9.      On Site Energy Company of Central Pennsylvania located in Pennsylvania;

10.     Onsite Energy Consulting, Inc. located in Oklahoma;

11.     Onsite Energy LLC located in Montana;

12.     On-Site Energy Solutions, LLC located in Missouri; and

13.     "Voice of On-Site Power Industry" slogan used by industry group ESGA (Electrical Generating Systems Association) the located in Florida.

Much of this evidence was known to Plaintiff at the time Plaintiff filed its application in the USPTO.

**B.      On Site Energy Has No Secondary Meaning**

ON SITE ENERGY is conceded to be, at best, merely descriptive because Plaintiff secured its registration under Section 2(f) of the Lanham Act. *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F. 3d 863 (8th Cir. 1994).

Thus, Plaintiff must meet the "vigorous evidentiary requirements" of proving secondary meaning. *See Thompson Med. Co. v. Pfizer, Inc.*, 753 F.2d 208 (2d Cir. 1985); *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F. 2d 1126 (2d Cir. 1979) ("evidence concerning attempts to popularize a mark is not conclusive" as to secondary meaning and "[c]learly a trademark owner makes a stronger showing as to the strength of his mark if he offers evidence probative of the effectiveness of his efforts").

14

Plaintiff cannot show that when relevant members of the public see, hear, or read the phrase "ON SITE ENERGY," they automatically associate this term with the Plaintiff or some other specific (even if anonymous) source. The fact is that the relevant public sees, hears or reads this phrase in many different places, in connection with many different sources and as a generic phrase. In addition:

(a) Plaintiff has not extensively advertised, promoted or marketed ON SITE ENERGY as a mark;

(b) those consumers who are expected to testify, aside from one or two, will say that they had never heard of Plaintiff before;

(c) Plaintiff has no consumer surveys showing secondary meaning;

(d) numerous third parties use the phrase;

(e) there has been at most minimal unsolicited media coverage of Plaintiff's services; and

(f) there have been no attempts to plagiarize Plaintiff's mark.

Under these circumstances, Plaintiff cannot establish secondary meaning and has no valid mark.

## VI. "MTU ONSITE ENERGY" IS NOT INFRINGING

Analysis of Plaintiff's infringement claim must be made by considering a number of well-established factors that bear on whether MTU's use of MTU ONSITE ENERGY infringes, i.e., whether that use is likely to cause confusion. *Polaroid Corp. v. Polaroid Elec. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961); *Lang v. Retirement Living Pub. Co., Inc.*, 949 F. 2d 576 (2d Cir. 1991) (apply *Polaroid* factors in reverse confusion case); *THOIP v. Walt Disney Co.*, 788 F. Supp. 2d 168 (S.D.N.Y. 2011) (same). Even if Plaintiff can show that it has valid trademark rights, MTU's use of ONSITE ENERGY does not infringe those rights.

**A.      Strength of the Mark – On Site Energy is Weak**

Because Plaintiff's claim is grounded in "reverse confusion," some courts suggest that the strength of the mark issue is not the strength of Plaintiff's mark but whether the Defendant's mark is sufficiently strong that it will overwhelm the Plaintiff's mark. *THOIP v. Walt Disney Co.*, 788 F. Supp. 2d 168 (S.D.N.Y. 2011). This may be true in cases where plaintiff has a unique mark. But where (as here) there is substantial third party use of similar terms or marks and significant generic use, consideration must be given to what effect that use has on the ability of Defendant – or anyone else for that matter – to "overwhelm" the Plaintiff's mark.

MTU's mark is incapable of overwhelming the Plaintiff's mark because Plaintiff's mark is already overwhelmed by the common use of the phrase in the industry.

**B.      Similarity of the Marks: The Distinguishing MTU Mark**

The parties' logos and uses are different and make clear these are two unrelated companies:





With a mark as weak as plaintiff's, the addition of the well-known MTU mark and logo to defendant's mark is sufficient to avoid infringement.  *E.g., Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1077-79 (2d Cir. 1993) (PARENTS in a stylized typeface was an extremely weak mark for magazines directed to parents and not likely to be confused with defendant's competitive Parent's Digest magazine using defendant's house mark LADIES HOME JOURNAL).

### C.   Proximity of the Products & Services: Rental vs. Sales Market

Plaintiff's rental market differs from MTU's sales market in many ways.  Plaintiff's rental market includes many business owners who have a short term emergency need for onsite energy.  These customers do not care what generator brand is delivered onsite; they just want power and want it fast.  Plaintiff's business also includes a substantial percentage of rentals of heaters and chillers, which MTU does not make or sell.

Some MTU units may be rented by MTU distributors.  In those situations, again, the brand name of the unit rented is irrelevant to the customer.  What the customer wants is power and it is the name and reputation of the distributor that matters.  MTU distributors do not use ONSITE ENERGY in their names.

As to the MTU units that are sold, brand does matter.  MTU works hard to educate consulting specifying engineers who put together plans for new facilities about the features and qualities of MTU products.  Plaintiff does not compete in this market because Plaintiff is not a manufacturer.  Plaintiff will not be able to establish any significant sales business with respect to new generators.

**D.**      **Bridging the Gap: Plaintiff has no Interest in Manufacturing Generators**

The generator manufacturing market is intensely competitive and the resources needed to produce generators are substantial.  Plaintiff is not likely to bridge the gap and begin competing with MTU.

**E.**      **No Relevant Actual Confusion Exists**

Plaintiff's evidence consists of (1) a few misplaced emails or phone calls to Plaintiff by persons looking to price or service MTU units who hit upon Plaintiff's website before they found MTU's website; and (2) a seriously-flawed survey.  The phone calls and emails are not from Plaintiff's customers or potential customers and are irrelevant to Plaintiff's reverse confusion claim.  *See Lang v. Retirement Living Publishing Co*., Inc., 949 F.2d 576, 579 (2d Cir. 1991). The survey is entitled to little or no weight as set forth in MTU's *Daubert* motion, given, among other things, the failure of the survey to address the correct universe and the use of an improper control.  *THOIP v. Walt Disney Co*., 788 F. Supp. 2d 168 (S.D.N.Y. 2011).

"If any confusion results, that is a risk the plaintiff accepted when it decided to identify its [company] with a mark that uses a well known descriptive phrase." *Cosmetically Sealed Industries, Inc. v. Chesebrough-Pond's USA Co.*, 125 F. 3d 28, 30 (2d Cir. 1997).

**F.**      **MTU'S Good Faith**

"Selection of a mark that reflects the product's characteristics, request for a trademark search and reliance on the advice of counsel are factors that support a finding of good faith." *See, e.g*., *Lang v. Retirement Living Publ'g Co*., 949 F.2d 576, 583 (2d Cir. 1991).    All three apply here.

MTU selected a generic phrase, cleared it with trademark counsel and uses it with the existing MTU brand name that is well-known in the generator industry.  There is no evidence that MTU intended to trade on Plaintiff or any other bad faith on the part of MTU.

18

### G. Quality of MTU's Product

MTU's products are admittedly of high quality. See Irvin French Deposition at 167:15-22.

### H. The Sophistication of the Buyers

The degree of care that purchasers or potential purchasers are likely to exercise in buying or considering whether to buy the product or services may depend on the level of sophistication of the potential buyers and the cost of the product or services at issue.

MTU will provide evidence of MTU's target audience of distributors and experienced engineers that would not be confused between Plaintiff's *rental* generators and MTU's manufactured generators. MTU will provide testimony about the long lead times and intensive efforts required to sell its products. MTU's business model is a far different selling model and customer base than the facility manager who wakes up one morning without power and needs a temporary solution and calls the Plaintiff to rent a generator. Emergency buys are never the result of sophisticated buying decisions. Further, both MTU's manufactured, new gensets and Plaintiff's rental contracts for used generators are expensive. Generally, people purchasing or entering a rental agreement for large dollar amounts are sophisticated enough to know the product they are buying and the difference between the Plaintiff's company and MTU.

## VII. PLAINTIFF HAS NOT BEEN DAMAGED

Plaintiff seeks $2 million because, essentially, Plaintiff has received a few misplaced phone calls and emails over the past four years. Plaintiff has no proof of lost sales. Plaintiff has no proof of damage to its reputation. Plaintiff has no proof that it has had to spend any funds on any sort of corrective or responsive advertising or that any such monies have been spent. Plaintiff could not prove that MTU's use of the generic phrase "onsite energy" used by so many others has caused MTU to make any profits it would not have otherwise made.

19

So, instead, Plaintiff seeks a "reasonable royalty."  For the reasons set forth in MTU's

Daubert motion (see Dkt. No. 44), there is no royalty that would be reasonable under the facts of

this case.  There is no evidence of licensing between or by either of the parties.  The plaintiff had

no registration at the time MTU's use commenced.  The plaintiff's mark is admittedly

descriptive.  There is significant evidence of extensive third party use and generic use.  The

marks are not identical because MTU uses its distinguishing house mark with the term at issue.

## VIII.   MTU'S USE OF ONSITE ENERGY IS A FAIR DESCRIPTIVE USE

MTU's use of the phrase "onsite energy" in its original non-trademark descriptive

meaning is permitted under the "fair use" defense, even if some "confusion" is generated by the

use.  15 U.S.C § 1115 (b)(4);  *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc*., 543

U.S. 111 (2004); *Charles of Ritz Group, Ltd. v. Marcon, Ltd*., 635 F. Supp. 158, 230 U.S.P.Q.

377 (S.D.N.Y. 1986) (junior user's use of "silken" as part of a color designation such as "Silken

Rose" for cosmetics was found to be a fair, non-trademark use which did not infringe the

registered mark SILK for cosmetics); *Wonder Labs, Inc. v. Procter & Gamble Co*., 728 F. Supp.

1058, 14 U.S.P.Q.2d 1645, 1649 (S.D.N.Y. 1990) (defendant's use of term "the dentists' choice"

in its advertising was fair use and did not infringe toothbrush manufacturer's "Dentist's Choice"

trademark).

By choosing a descriptive term, the trademark owner must live with the result that

everyone else in the marketplace remains free to use the term in its original "primary" or

descriptive sense.  *See Cosmetically Sealed Industries, Inc. v. Chesebrough-Pond's USA Co*., 125

F.3d 28 (2d Cir. 1997); *Car-Freshner Corp. v. S.C. Johnson & Son, Inc*., 70 F.3d 267, 36

U.S.P.Q.2d 1855 (2d Cir. 1995) (finding descriptive the use of a pine-tree shaped air freshener).

MTU will establish its defense with proof that:

1)     MTU's use of the term is not as a trademark or service mark but to

describe the nature of its business and distinguish its MTU ONSITE

ENERGY unit from its MTU engine unit;

2)     MTU uses the term in good faith and fairly; and

3)     MTU uses the term only to describe its goods or services.

The mere fact that the MTU use of ONSITE ENERGY is sometimes prominent does not

render the defense unavailable.  *See, e.g., Sunmark, Inc. v. Ocean Spray Cranberries, Inc.*, 64 F.

3d 1055 (7th Cir. 1995) (even where defendant made prominent use of term, the possibility that

the trier of fact will disqualify Ocean Spray's employment of "sweet-tart" from the fair use

defense by calling it a trademark found to be too remote to support a preliminary injunction; the

Court also had "some difficulty understanding how Ocean Spray can be said to use the words

'sweet-tart' as a way of identifying the origin of its product, an essential ingredient of usage as a

trademark" when the term was descriptive).

"The use of a similar name by another to truthfully describe his own product does not

constitute a legal or moral wrong, even if its effect be to cause the public to mistake the origin of

the product." *William R. Warner & Co. v. Eli Lilly & Co.*, 265 U.S. 526, 528 (1924).

## IX.   MTU CONTINUOUSLY USED "MTU ONSITE ENERGY" IN MANY REGIONS PRIOR TO ANY USE IN THOSE REGIONS BY PLAINTIFF

Plaintiff's business is, by and large, dedicated to providing generator *rentals* in New

York, New Jersey, and Connecticut.  Plaintiff is not authorized to do business in and has done at

best very limited business in other states.

MTU, on the other hand, launched its MTU ONSITE ENERGY name in 2008 on a

national basis.   MTU, as an innocent prior user in those regions where plaintiff had no business

prior to the filing of plaintiff's application in 2009, is the senior user entitled to continue using

the mark.  *See* 15 U.S.C. § 1115(b)(5); *Thrifty Rent-A-Car System v. Thrift Cars, Inc.*, 831 F. 2d

1177 (1st Cir. 1987).

## X.      PLAINTIFF'S REGISTRATION WAS PROCURED BY FRAUD

Trademark procurement by fraudulent means occurs "when an applicant knowingly

makes false, material representations of fact in connection with his application."  *In re Bose*

*Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009), *quoting Torres v. Cantine Torresella S.r.l.,* 808

F.2d 46, 48 (Fed. Cir. 1986).

As outlined above in Section IV, and in the briefing on Plaintiff's motion in limine

directed to the fraud evidence (Dkt. No. 59), Plaintiff submitted a statement that its use of the

mark was "substantially exclusive" when Plaintiff knew that not to be the case.  There is no

doubt that Plaintiff was aware of the falsity of this statement because MTU's attorney forwarded

176 pages worth of proof of such use to Plaintiff's counsel months before Plaintiff made the

statement at issue.

The PTO relied upon the veracity of Plaintiff's false statement in issuing the registration.

The registration should be cancelled on this ground alone.

## XI.     PLAINTIFF'S DELAY IN TAKING ACTION PREJUDICED MTU

An initial round of correspondence in early 2009 ended with a letter from MTU's counsel

attaching 176 pages of damning evidence demonstrating that the phrase "onsite energy" was not

protectable.

Then, there was silence from Plaintiff for nearly a year.

During that year, two things happened.

First, MTU continued to invest in and develop its business using the name MTU ONSITE

ENERGY.  Second, Plaintiff perpetrated its fraud on the Trademark Office.

Once Plaintiff secured its registration, Plaintiff pursued this action.  And now Plaintiff seeks not only to stop MTU's use but to recover a royalty on sales MTU generated during that year of Plaintiff's silence.

## XII.   MTU'S REQUESTED RELIEF

### A.   Cancellation of Plaintiff's Trademark Registration

Plaintiff's registration should never have issued because the mark is generic or is merely descriptive and has not acquired secondary meaning.  The registration only issued because Plaintiff submitted a false statement to the PTO.  The registration should be cancelled.

### B.   Declaratory Judgment

For all of the reasons noted above, MTU is entitled to a declaratory judgment that "onsite energy" is a generic phrase not entitled to protection in connection with onsite energy products and services and that Defendant's use of MTU ONSITE ENERGY does not infringe any rights of Plaintiff.

### C.   Costs and Attorney's Fees

MTU also seeks an award of the costs and attorneys fees it has incurred to defend against this action, in accordance with section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a).

## XIII.   CONCLUSION

"Onsite energy" is a generic or descriptive phrase free for all to use.  Plaintiff's

registration should be cancelled and the Court should dismiss Plaintiff's claims against MTU.

Dated: July 23, 2012                              Respectfully submitted,

                                                  /s Kathleen E. McCarthy
                                                  Kathleen E. McCarthy (KM-9219)
                                                  KING & SPALDING LLP
                                                  1185 Avenue of the Americas
                                                  New York, New York 10036-4003
                                                  Tel: (212) 556-2100
                                                  Fax: (212) 556-2222
                                                  kmccarthy@kslaw.com
                                                  Attorney for Defendant
                                                  MTU ONSITE ENERGY CORP.

<u>CERTIFICATE OF SERVICE</u>

This is to certify that the foregoing DEFENDANT MTU ONSITE ENERGY CORP.'S PRETRIAL MEMORANDUM was electronically served by filing in the Court's CM/ECF system, which will automatically send email notification of such filing upon the following counsel of record:

Kurt N. Jones
Woodard Emhardt Moriarty McNett & Henry LLP
111 Monument Circle, Suite 3700
Indianapolis, IN 46204
kjones@uspatent.com

Jonathan Sinnreich
Annalee Cataldo-Barile
Sinnreich Kosadoff & Messina
267 Carleton Avenue, Suit 30 I
Central Islip, NY 11722
abarile@skmlaw.net

This 23rd day of July 2012.


    s/ Kathleen E. McCarthy